[Cite as *State v. Fields*, 2013-Ohio-3031.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                    :

    Plaintiff-Appellee          :              C.A. CASE NO.    25461

v.                               :              T.C. NO.    12CR936

SAMUEL J. FIELDS                 :              (Criminal appeal from
                                                Common Pleas Court)

    Defendant-Appellant         :

                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___12th___ day of ____July____, 2013.

. . . . . . . . . .

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

NICHOLAS G. GOUNARIS, Atty. Reg. No. 0064527, 130 W. Second Street, Suite 1818, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**    This matter is before the Court on the Notice of Appeal of Samuel J. Fields,

filed November 9, 2012. Fields appeals from his judgment entry of conviction, following a jury trial, on one count of felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree. The jury also found Fields not guilty of the offense of aggravated robbery, in violation of R.C. 2911.01(A)(3). After noting that the instant offense is Fields' 13th felony conviction as an adult, the court sentenced him to a mandatory term of four years imprisonment. Fields asserts that there was insufficient evidence of serious physical harm to support the jury's guilty verdict. We hereby affirm the judgment of the trial court.

{¶ 2} At trial, Stephanie Sutherland testified that Fields used to be her drug dealer, and that on March 2, 2012, she met Fields at RiverScape MetroPark for the purpose of obtaining a heroin "tester" from him, with the understanding that she would purchase $20.00 worth of the drug if she approved of the "tester." Sutherland stated that a "tester" is a small amount of heroin "that a drug dealer gives you to pull your business in." She stated that she "hadn't got anything from him for about two weeks, and that was his way of kind of reeling me back in."

{¶ 3} Sutherland stated that when she met Fields, his girlfriend, Nichole Moyer, was with him. Sutherland stated that she took the "tester" into the concession stand bathroom, and that she remained in the bathroom for a long time because "all my veins were shot, so it took a long time to hit myself." She stated that Moyer eventually entered the bathroom to check on her, and that the two women left the bathroom together.

{¶ 4} Sutherland testified that after she emerged from the bathroom, she told Fields that she did not like the heroin, and that she was not going to purchase any from him.

Sutherland stated that Fields then demanded $10.00 from her, and when she refused to pay him, he "reached in my pockets and took everything out. He took my cigarettes, my lighter, I had like $3 in there, the needle, the spoon, and my phone."  Sutherland stated that she tried to retrieve her phone from Fields, and he "hit me once in the face and I went straight down. And then I went to grab a hold of his pocket * * * the phone was in his pocket.  I went to grab for where my phone was, and he just kept hitting me.  And he hit me anywhere from 20 - - I know it was at least 20 times.  20 to 24, 25 times.  And I held on to his pocket the whole time."  Sutherland further testified, "I don't know if I was wedged between [a] park bench and the - - I didn't get wedged until every time he hit me, my body kept going back and back and back.  I don't know, he must have kicked me at some point because I ended up with a broke rib, and * * * my eyes ended up swelling shut." Sutherland stated that she was wedged "somewhere between a park bench and a trash can."

{¶ 5}    Sutherland stated that Fields stopped hitting her when "he saw a woman calling the cops like, maybe 30 feet away from us."  She stated that she retrieved her phone from Fields' pocket and tossed it on the ground, and that she heard the woman on the phone calling to her to "'come here.'" Sutherland stated that she approached the woman while Fields and Moyer walked away.  Sutherland stated that the woman told her that she had the police on the phone, and Sutherland testified, "I have a little history with cops. * * * I took off running."  Sutherland stated that she has felony convictions for theft, possession, assault on a police officer, and "[h]arassment by an [i]nmate with [b]odily [f]luids."

{¶ 6}        Sutherland stated that she ran to her home, about a quarter mile away. She testified, "I know it sounds weird that it would instantaneously do this, but like my

equilibrium was off. I bumped into like three trash cans on the way. * * * I got home, and as I sat there longer and longer, the swelling got worse * * * ." She stated that she called her best friend, who later took her to the Huber Health Center. Sutherland stated that she had pain in her face, tail bone, and ribs. Sutherland stated that her eyes were black for five or six weeks, and that on her forehead she "had knots for like six or eight weeks." She stated that the pain in her tail bone was "just from being scooted against concrete, I guess." Sutherland testified that two of her ribs were broken, and that the pain in her ribs lasted three months, "at least." Sutherland stated that she was prescribed Hydrocodone for pain, and that she "sold them to get - - heroine's (sic) the best pain killer you can get." She identified photographs depicting her injuries. Sutherland also testified that she has been sober for five months.

{¶ 7} On cross-examination, Sutherland admitted that she never intended to pay Fields for any heroin, and that "[i]t was a scam I was running on him that day." She denied that she and Fields were ever in a romantic relationship. The following exchange occurred on cross-examination:

Q. And I think you testified on direct examination, you think he might have kicked you.

A. I think so. I don't know how my ribs got broke. I don't know if he kicked me or if when he was punching me, because of how my body was, if that's how they broke.

Q. So you don't know that he kicked you.

A. I think he kicked me.

{¶ 8}     Donna LaChance testified that she was driving her car in the area of RiverScape at around 12:30 p.m. on the date of the incident, and that she "saw some commotion over at RiverScape, near the Bike Hub."   LaChance testified that she realized she was witnessing an assault, and she "went through the intersection, pulled my car to the curb, exited my vehicle, took my phone and immediately called 911."   She further testified as follows:

> * * * as I passed through the intersection and looked over to the RiverScape I saw a gentleman grab a woman by the back of the head, grabbed her hair.   He raised his fist, punched her in the face.  She stumbled.  He punched her again and she fell to the ground, at his feet.   She then attempted to protect her head and her face while he continued to punch her in and about the head and face.    Multiple times.
>
> * * *
>
> I don't know whether the man who was assaulting a woman realized I was there or if she somehow saw that I was there.    But he turned and saw me over his shoulder, stopped.   They exchanged some words.   She got up.   And then he started to walk away and tried to call her over towards me (sic).   Because I still had dispatch on the line.
>
> * * *
>
> I couldn't hear what was exchanged between the two of them, but as she walked towards me, she said, "He tried to take my phone."   She was also complaining about the pain in her face, but she said, "He tried to take my phone."

{¶ 9}     LaChance further stated that Sutherland's face "was red and it was starting to

swell up. Which is why I called her to me, because I wanted to see if she would allow them to send an ambulance to the scene." According to LaChance, Sutherland said, "'I can't. My face. My head.' And she started to walk away from me * * * ." LaChance stated that there "was another woman who was a bystander to the entire assault," and that she and Fields left the area together and then parted ways. LaChance stated that she initially followed Fields, and that she "got a good look at him."

{¶ 10} Nichole Moyer testified that Fields is her boyfriend, and that the two of them, on the date of the incident, met Sutherland who, according to Moyer, used to date Fields. The purpose of the meeting, Moyer stated, was to give Sutherland money for her cell phone bill. Moyer stated that she observed Sutherland enter the restroom at RiverScape, and that when Moyer subsequently entered the restroom, she observed Sutherland "hurrying putting stuff in her purse." When the women exited the restroom, Moyer stated that Sutherland approached Fields and began reaching into his pockets. She stated that Fields warned her to "get out of his pockets," and that when Sutherland refused to do so, "he started to hit her." Moyer stated that the assault ended when Fields observed LaChance. Moyer stated that the interaction between Fields and Sutherland lasted 45 seconds, and that she did not observe Fields kick Sutherland. She stated that the three of them walked away after observing LaChance on the phone. Moyer denied that Fields was a drug dealer.

{¶ 11} Fields testified that he dated Sutherland for six months when he returned from prison for a previous assault offense, and that he "would go buy her food stamps and a Pace card from somebody I know that was selling them for half price * * * . And sometimes I would give money to pay her phone bill." Fields stated that he broke up with Sutherland when he learned

she was using drugs. He stated that she contacted him the night before the incident and said she needed money for her phone bill. Fields stated that as he approached RiverScape to meet Sutherland, he observed her exchanging items with a known drug dealer, and that Sutherland then proceeded to the restroom. Fields stated that he approached the man with whom Sutherland had met, and that the man told him that he sold Sutherland some heroin.

{¶ 12} After briefly waiting for Sutherland, Fields stated that he sent Moyer into the restroom to get her. When Sutherland subsequently approached him, Fields stated that he advised her that he knew she was using drugs, and that he would not give her any money for her phone bill, since she had money for drugs. According to Fields, "that's when Stephanie started grabbing on my pocket. No, I need some - - I need some money, I need some money." He stated that while he could have pulled Sutherland's hand from his pocket, he did not do so because she had his money in her hand, and he was concerned that she would run away with it, or that it would blow away in the wind. Fields stated that he warned Sutherland that he would hit her if she did not let go. When she refused, he stated that he "hit her, and she fell. She fell to the ground." When asked where he struck Sutherland, Fields replied, "It was her forehead. And I believe that's where the lump came from." Fields stated that he hit her "no more than five times." He denied kicking Sutherland, and stated that since her hand remained in his pocket, he could not have done so, "because my knee would hit her face first, because she's, like, knee level with me if I was to kick her. It's not possible."

{¶ 13} Fields stated that when he observed LaChance on her cell phone, he told Sutherland, "We about to send us both to jail. Let me go. Then that's when Stephanie let me go." Fields acknowledged that LaChance followed him, and he stated that when he realized she

was doing so, he approached her vehicle. According to Fields, "when I walked towards her car, she drove away, which I kind of understand, because she just seen this big black guy just beat up on this little white girl, * * * , being in her shoes, I would have took off too." On cross-examination, Fields denied being a drug dealer. In the course of the assault, Fields stated that he "never touched her body at all. It was her face."

{¶ 14} Fields asserts one assignment of error herein as follows:

"INSUFFICIENT EVIDENCE WAS PRESENTED TO SUPPORT THE VERDICT ON COUNT II, FELONIOUS ASSAULT."

{¶ 15} Fields asserts that "bruising, swelling, and a scratch" do not constitute serious physical harm, and that while "broken ribs may qualify as 'serious physical harm,' the State failed to prove beyond a reasonable doubt that Fields" broke Sutherland's ribs.

{¶ 16} As this Court has previously noted:

When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn* (2000), 138 Ohio App.3d 449, 471. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio

St.3d 259, paragraph two of the syllabus. *State v. Hammock*, 2d Dist. Montgomery No. 24664, 2012-Ohio-419, ¶ 11.

**{¶ 17}** R.C. 2903.11provides: "(A) No person shall knowingly * * * (1) Cause serious physical harm to another * * * ." R.C. 2901.01(A) provides in relevant part:

(5) "Serious physical harm to persons" means any of the following:

* * *

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**{¶ 18}** As this Court has previously noted:

"The degree of harm that rises to the level of 'serious' physical harm is not an exact science, particularly when the definition includes such terms as 'substantial,' 'temporary,' 'acute,' and 'prolonged.'" *State v. Irwin*, Mahoning App. No. 06MA20, 2007-Ohio-4996. Under certain circumstances, a bruise can constitute serious physical harm because a bruise may satisfy the statutory requirement for temporary serious disfigurement. *State v. Worrell*, Franklin App. No. 04AP-410, 2005-Ohio-1521, at ¶ 47-51, reversed on other grounds by *In re Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 313, 847 N.E.2d 1174, 2006-Ohio-2109. In *State v. Plemmons-Greene*, Cuyahoga App. No. 92267, 2010-Ohio-655, the Eighth District Court of Appeals found that the State

presented sufficient evidence of serious physical harm where, as a result of the defendant's attack, the victim suffered a black eye, bruising and swelling to the right side of her face, scratches on her neck, and bruising on her thighs and buttocks. *State v. Bootes*, 2d Dist. Montgomery No. 23712, 2011-Ohio-874, ¶ 19 (finding serious physical harm where the victim suffered two black eyes and other bruising on her face and chest, a broken nose and a mild concussion.)

Further, "'[w]here injuries to the victim are serious enough to cause him or her to seek medical treatment, a jury may reasonably infer that the force exerted on the victim caused serious physical harm as defined by R.C. 2901.01(A)(5).' *State v. Wilson* (Sept. 21, 2000), Cuyahoga App. No. 77115 (citations omitted)." *State v. Jones*, 8th Dist. Cuyahoga No. 80841, 2002-Ohio-6635,¶ 16.

{¶ 19} Having thoroughly examined the record before us, in a light most favorable to the State, we conclude that if believed, the evidence presented by the State would convince the average mind that Sutherland suffered serious physical harm as a result of Fields' assault. Sutherland sought treatment for her injuries, and the State presented photographic evidence that Sutherland suffered two black eyes, substantial swelling on her face, scratches on her neck, and a large knot on her forehead. Sutherland stated that the bruises on her face lasted for five or six weeks, and the knot on her forehead lasted six or eight weeks, and we conclude that the State presented sufficient evidence of temporary serious disfigurement such that the element of serious physical harm is established.

{¶ 20} Sutherland further stated that she had pain for three months in her ribs, which she stated were broken as a result of the assault, and that she was prescribed medication for pain.

We conclude that the State presented sufficient evidence of prolonged pain. While Fields asserts that the State failed to prove that he broke Sutherland's ribs, her testimony, if believed, that as a result of either being kicked or being wedged between a bench and a trash can by him, she experienced rib pain for three months, is sufficient evidence of prolonged pain and serious physical harm. Finally, as discussed above, the State independently established the element of serious physical harm by means of Sutherland's temporary serious disfigurement.

{¶ 21} There being no merit to Fields' sole assigned error, it is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, P.J. and HALL, J., concur.

Copies mailed to:

April F. Campbell
Nicholas G. Gounaris
Hon. Mary L. Wiseman